GEE *v.* BRUNT.

1. MASTER AND SERVANT—MINORS—HAZARDOUS EMPLOYMENT—
   EVIDENCE—QUESTION FOR JURY.

   In an action for personal injuries, where plaintiff, a boy
   17 years of age, fell against the saw and was injured
   while working as an "off-bearer" on defendant's portable
   saw-mill, evidence tending to show that plaintiff's em-
   ployment was hazardous, *held*, sufficient to carry the
   question to the jury.

2. SAME—CHILD LABOR LAW—NEGLIGENCE.

   The jury having found that plaintiff's employment was
   hazardous, his employment at such work without the ap-
   proval of the department of labor was in violation of
   the statute (2 Comp. Laws 1915, § 5330 *et seq.*) and
   constituted actionable negligence.

3. SAME—WRONGFUL EMPLOYMENT OF MINOR—PROXIMATE CAUSE.

   The causal connection between a minor's injury and his
   wrongful employment will characterize the latter as a
   proximate cause.

4. SAME—ASSUMPTION OF RISK—NEGLIGENCE OF FELLOW-SERVANT.

   Where an employer wrongfully employs a minor at haz-
   ardous employment, in the pursuit of which he is in-
   jured, the defenses of assumption of risk and negligence
   of a fellow-servant are not available in an action there-
   on.

5. SAME—EVIDENCE—QUESTION FOR JURY.

   The controverted question of plaintiff's employment on the
   afternoon of his injury was under the evidence properly
   left to the jury.

6. SAME—CONTRIBUTORY NEGLIGENCE—EVIDENCE—QUESTION FOR
   JURY.

   Where defendant's claim that plaintiff was guilty of con-
   tributory negligence as a matter of law because he
   selected an unsafe way to "off-bear" when a safe one was
   known and open to him was controverted by plaintiff's
   testimony to the effect that there were no two ways

The question as to whether one employing child under
statutory age may rely on contributory negligence or assump-
tion of risk to defeat liability for personal injury to latter, is
discussed in notes to 12 L. R. A. (N. S.) 461; 20 L. R. A. (N.
S.) 876; 48 L. R. A. (N. S.) 667.

On the general question of assumption of risk by minor
servants, see note in 1 L. R. A. (N. S.) 279.

open to him, the trial court properly left to the jury the questions of plaintiff's contributory negligence and as to whether there were two ways open to him.

7. SAME—DAMAGES—INSTRUCTIONS.

Where the charge to the jury on the question of damages was very full and complete, and as a whole correctly stated the law applicable to the case, it will not be reversed, although certain portions were unhappily worded, and, standing alone, might be misunderstood.

Error to Lenawee; Hart (Burton L.), J. Submitted January 12, 1921. (Docket No. 124.) Decided July 19, 1921.

Case by Philip Gee, Jr., an infant, by his next friend, against Albert Brunt for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Baldwin & Alexander* and *J. N. Sampson,* for appellant.

*Wood & Rathbun* and *Herbert R. Clark,* for appellee.

STEERE, C. J. On April 28, 1919, Philip Gee, Jr., a lad 17 years of age, while working as an "off-bearer" on defendant's portable saw-mill in the township of Deerfield, Lenawee county, fell against the saw which entirely cut off his left leg above the knee and injured his left arm at the elbow so as to permanently cripple it. Imputing the accident to defendant's negligence this action was brought to recover damages for such injuries. Numerous grounds of negligence are charged in plaintiff's declaration, amongst which are failure to provide a safe place in which to work, failure to protect the machinery as required by law, failure to instruct plaintiff as to the safe and proper method of doing his work and warning him of the dangers attending it, employment of incompetent fellow-servants and setting plaintiff, a minor under

18 years of age, to work at hazardous employment, in violation of Act No. 255, Pub. Acts 1915 (2 Comp. Laws 1915, § 5330 *et seq.*), which in section 11 provides, amongst other things, "No male under the age of eighteen years shall be * * * employed * * * in any hazardous employment," with a proviso that a male over 16 and under 18 years of age may be employed except in certain specified occupations if his employment is first approved by the department of labor as not being unduly hazardous. Defendant pleaded the general issue under which he made total denial of all grounds of negligence charged against him and also contended plaintiff was not at the time of the accident in his employ but had simply volunteered his help.

It was undisputed that defendant had not elected to come under the workmen's compensation law nor obtained from the department of labor approval of plaintiff engaging in any hazardous employment. Plaintiff recovered verdict and judgment for $6,000 and defendant removed the case to this court for review on various assignments of error, three of which are argued in appellant's brief. They in substance involve but two contentions, *first*, that a verdict should have been directed for defendant because it appeared there was a safe and unsafe way to do the work in which plaintiff was engaged and he was guilty of negligence as a matter of law in adopting the dangerous method; and *second*, reversible error was committed by the court in charging the jury upon the measure of damages.

Defendant was a farmer, owning a large amount of land in Deerfield township upon a portion of which there was considerable timber. He had purchased a second-hand portable saw-mill made by the Port Huron Manufacturing Company. The mill had been upon his place about a year, operated a part of the

time by the party from whom he purchased it. Plaintiff was injured about two weeks after defendant bought the mill and ran it with his own crew, while he was doing a job of sawing material for bridges. On the morning of the accident before they commenced work plaintiff who lived near by came over and defendant asked him to take the place of one of his sons who had been working but was then away, and he did so. Defendant told him to help roll up logs when wanted and when they were sawing to help carry away the sawed material, or "off-bear" as it is termed. He worked during the forenoon and until he was injured about the middle of the afternoon.

Plaintiff was a normal, able bodied boy raised on a farm, who had attended district school until he finished the sixth grade, had no experience or training in any calling except work on a farm for his father and neighbors, or knowledge of machinery aside from agricultural implements in common use, had seen portable saw-mills in use but never worked on one before.

On the day plaintiff was injured he and defendant's son Frank, a man of mature years, worked as off-bearers. Defendant was around the mill and occasionally helped at that work. During the forenoon they sawed posts and lumber. Some of those pieces one man could carry. Shortly before the accident they commenced sawing 3-inch oak plank requiring two men, one at each end.

Of the situation, his work, and the accident plaintiff testified in part as follows:

"This was a portable saw-mill and the saw was placed in what was called the husk, and the husk was made of planks on three sides, the east, west and south sides, and the saw was on the north side, and there was a track on which the carriage ran on the north side of the saw and this track was made with little iron strips with three corner rail on which it ran,

and these were laid on boards resting on blocks on the ground. * * * There was a pulley on the other end of the shaft to which the belt was attached, which ran to the engine which was located east of the mill. The engine was on the south side of the track, and about 30 or 35 feet away, and about five feet from the end of the track. * * * The log was brought up to the saw by the carrier and after the board or slab was sawed off it would run back to the west and when the board was first sawed off it would drop on the ground about a foot from the saw, and we would pick it up and carry it away. * * * I was told to pile this stuff on the north side of the track by Mr. Brunt. That is where he piled it. In order to pile it there we had to carry it across the track. * * * One of us would be at each end of the plank or board, and I was instructed to carry the end next the saw, and as I stood there to pick up the board the saw would be at my left and the belt would be back of me four feet, and the track would be in front of me, and the cable would be running in the center of the track a part of the time and the saw would be running part of the time when we were picking up this lumber and carrying it away * * * We carried boards in the forenoon and plank in the afternoon, and some posts. * * * Mr. Brunt's son, Frank, was at the other end assisting me. He is about 40 years old. * * * When we started to pick up this plank Mr. Brunt's son, Frank, and I picks up the plank, and I was watching Frank and thought he might drop it the first time I was watching him, and when he goes to drop it I drops mine at the same time. Then I tells Frank, 'you hang on to your plank now, I am pretty close to the saw.' He says, 'All right.' We got hold of the plank and just as I stepped up on the track he lets his end drop and throws it out of my hands, and it strikes me about five inches above my right knee, and throws me right backwards right into the saw. As I was going into the saw I throws my arm like that to save from getting me into the saw, and it gets my arm and throws my leg in between the roller and the saw and cuts my leg off, * * * This plank was heavier and larger than any plank we had sawed before that. This was the first

one of the large heavy plank, heavy oak plank. It was about 14 feet long, 14 inches wide and 3 inches thick."

The testimony of other witnesses to the accident though varying in details is in general to the same effect. George Pieh, an old acquaintance of defendant who was then working for him as "setter,"—riding the carriage and setting the log to the saw for each new cut,—described the mill which had a 54-inch saw as set east and west, explained its operation, work of the crew, etc., in greater detail, and said in part:

"The engine was about 35 feet east, and it was 32 feet from the saw end of the husk to the northeast end of the track. It was about 5 feet from the south rail of the track to the drive belt, and the off-bearers as they came to get a plank would go between the belt and the track. The board after it was sawed off would be between the belt and the track. At the time of the accident the plank was 3x12x14, white oak. Frank Brunt and Philip Gee were doing the off-bearing. Philip was working next to the saw. I saw them pick up this plank. I was down in the pit getting some sawdust out from under the saw, * * * and as I stepped out Philip dropped his end of the plank. I got up to set the next plank up and as I turned around they were starting out with it again. I was just going to set the other plank up when he dropped his end the second time and started stumbling backwards toward the saw, and fell with his left leg between the lumber guide and the saw. He throwed his arm over the saw some way. It was done so quick. * * * When Philip fell into the saw it cut his leg off, it threw it a hundred feet or better and he exhibited signs of pain and suffering. * * * He was going in a northeast direction, and dropped his end and stumbled backwards and fell into the saw."

Clyde Harrison, plaintiff's head sawyer, testified of the accident in part as follows:

"Well, Frank Brunt took the plank. He had hold

of the end of the plank and pulled it off from the end of the husk and it dropped down. \* \* \* Frank Brunt picked up the end of the plank and pulled it out. \* \* \* Then this Gee boy came in there and got hold of the end of the plank at the end of the husk. They both picked the plank up and dropped it. Then Frank picked up his end and the boy picked up his end and got it up a little ways, and dropped it and staggered back towards the saw; in fact went into the saw in some shape or other."

Mrs. Agnes Tucker, who lived across the road from where they were sawing, testified to seeing Frank Brunt and the Gee boy working there that afternoon and said:

"I just happened to go to the window as Philip Gee's leg flew some four or five rods, and I saw Frank was holding the end of the plank, and the Gee boy, when he got hurt."

Off-bearing from a veneer saw in a mill has been held hazardous employment as a matter of law. *Unnewehr Co.* v. *Insurance Co.*, 99 C. C. A. 490, 176 Fed. 16. There was certainly sufficient evidence in this case tending to show plaintiff's employment was hazardous to carry the question to a jury, and, if so, his employment at such work without approval by the department of labor was in violation of law, constituting actionable negligence. *Sterling* v. *Union Carbide Co.*, 142 Mich. 284; *Braasch* v. *Michigan Stove Co.*, 147 Mich. 676; *Syneszewski* v. *Schmidt*, 153 Mich. 438; *Sargent Manfg. Co.* v. *Insurance Co.*, 165 Mich. 87, 93 (34 L. R. A. [N. S.] 491); *Radic* v. *Jackson & Co.*, 178 Mich. 618; *Great Lakes Laundry Co.* v. *Insurance Co.*, 184 Mich. 294; *Kruczkowski* v. *Publishing Co.*, 203 Mich. 211.

An examination of those cases shows it has been held that the causal connection between the minor's injury and his wrongful employment will characterize the latter as a proximate cause, and when the

question of unlawfully engaging the minor in hazardous employment has been determined adversely to defendant assumption of risk and negligence of a fellow-servant are no longer available defenses; although in the instant case the court favored defendant by squarely submitting those two claimed defenses to the jury also, without contingency.

In charging the jury the court put the burden of proof on plaintiff as follows:

"The plaintiff must satisfy you by a preponderance of the evidence on all the following propositions:

"(1) That he was in the employ of the defendant at the time of his injury; (2) That the employment was of a hazardous nature;  *  *  *  that defendant was negligent; (3) Defendant's negligence was the proximate cause of plaintiff's injury; (4) That plaintiff's injury was not an assumed risk; (5) That plaintiff's injury was not caused by the negligence of a fellow-servant; (6) That plaintiff was not himself guilty of contributory negligence that contributed to the injury; (7) The amount of damages."

Defendant's testimony that plaintiff was hired by him only for the forenoon and was not in his employ when injured is met by direct testimony to the contrary and was properly left by the court to the jury.

Determination by the jury that the employment was hazardous would dispose of the assumed risk, fellow-servant's negligence, proximate cause and, *prima facie* at least, defendant's negligence, although there was further testimony in the case which raised issues of fact on those questions.

There was testimony to go to the jury upon the question of plaintiff's contributory negligence. Defendant contends that he was guilty of contributory negligence as matter of law because he selected an unsafe way when a safe one was known and open to him. (Citing cases.) Under certain circumstances the courts have held such conduct contributory negli-

gence. The claim is predicated mainly on plaintiff's admissions in answer to leading questions on cross-examination, the strongest of which are as follows:

"*Q.* Now, if you had taken that plank and gone right straight east—

"*A.* We didn't go straight east.

"*Q.* If you had, there was not any danger, was there?

"*A.* No.

"*Q.* Not a bit.

"*A.* No.

"*Q.* You knew that, didn't you?

"*A.* Why, I didn't know that. * * *

"*Q.* If you had picked that plank up, or when you picked it up, if you had gone right straight east with the plank, there would not have been any danger, would there?

"*A.* Why, no.

"*The Court*—If you want to explain you can.

"*A.* Mr. Brunt when he off-bore with me, didn't go to the east. We just took it from the saw and went right straight across the track. * * *

"*Q.* When you picked it up you went right in front of the saw, you knew that was a dangerous way to go?

"*A.* Yes."

If plaintiff's testimony is to be believed there were no two ways by which they off-bore plank to the piling place north of the track. He was stationed at the east, closest to the saw with a man of mature years and experience at the other end of the plank presumably in charge who would naturally control this inexperienced boy in the course they took. If the accident befell him by reason of going across the track instead of around the east end of it he must at that time have gone on or across the track to the east and north of the saw and when the accident happened fallen to the southwest to come in contact with it. Defendant and his son both testify positively that plaintiff fell northwest in to the saw. If so, crossing the track had nothing to do with the accident. De-

fendant was interrogated upon that subject and answered as follows:

"*Q.* Now, did he carry the plank away, so far as you saw?

"*A.* No, I don't think they carried it a foot.

"*Q.* He picked it up and dropped it, then he picked it up a second time?

"*A.* Yes, sir, and the plank laid right there on top of the other one after it occurred.

"*Q.* And the boy in order to get into the saw went over to the—

"*A.* Over to the northwest into the saw.  *  *  *

"*Q.* There has been some testimony here that they started to go and had gone across and gotten partly over onto the track?

"*A.* It was no such thing. How could they? There was a big pile of saw-dust, as high as my head if it hadn't been leveled off."

Defendant's son Albert, who saw the accident, testified:

"At the time he picked this plank up he was standing southeast from the saw, and fell over backwards to the northwest toward the saw.  *  *  *  They were about a foot and a half south of the track.  *  *  *  He didn't start carrying this plank across the track going north.  *  *  *  Philip was facing the east when he picked up the plank."

Defendant's son Ralph, in describing the accident, said:

"They picked it up and they both dropped it, and then they picked it up again, and Philip dropped his end and commenced staggering back and fell into the saw."

Under defendant's version of the event the boy was to the southeast of the saw and fell northwest against it. If he had not started across the track with the plank, as defendant and his son Albert both positively testify, there was no question of a safe or unsafe way involved. There is a conflict in the testimony as to

just where he was and what direction he fell when injured. There is testimony that defendant himself when assisting to off-bear carried directly to the north across the track and not only showed by example but instructed plaintiff to do the same. He was an inexperienced boy working with and under the direction of experienced men of mature years. We think the court properly submitted the question of his contributory negligence to the jury; and when doing so he also left to them the determination of whether or not there were two ways by which the carrying away could be done, one safe and one unsafe, and if so whether plaintiff—

"used ordinary care and prudence or not, considering what he knew or could see, his location at the work, whether he had been warned or not, and whether he knew and appreciated the dangers or not; in fact the question of contributory negligence is to be determined by you from all the facts and circumstances of the case."

The charge was very full and complete upon the subject of contributory negligence, and fair to defendant.

Defendant's objections to the charge of the court as to damages are directed against the manner of computing rather than the measure of damages. It is urged that in the portion of the charge relating to computing future damages the court ignored the true rule "that the loss would be the difference between what this boy might have earned and what the jury find he would have earned in his disabled condition;" and attention is particularly called to a paragraph of the charge in part as follows:

"For instance, the first thing you do, if you come to the question of damages, you would say: How much should we allow plaintiff for damages for pain, suffering and humiliation from the time he was in-

jured up to now? Then next, how much shall we allow him for future pain and suffering, and in determining that you will arrive at it in this way: How much will his damages be for the next year for pain and suffering? If you should find that would be $300 or $500 or $200, or whatever it might be, or it might not be anything; but if you find any sum for next year, you would divide that sum by 1.05, and that will give you the present worth of his suffering for next year. Then you will say, what will he suffer the second year from now? * * * Whatever amount, you will divide that by 1.10. If you find he will suffer the third year, you will divide that by 1.15, and for the fourth year by 1.20, and so on for each year. The same rule applies to his earning capacity. Whatever sum you find he would earn the first year after he is 21, you will divide that by 1.20, because it is 4 years before he is 21." * * *

It may be conceded the charge at that point is not happily worded and standing alone might be understood as indicating that what he would earn in the future uninjured should be taken as the basis in determining damages for loss of earnings, regardless of anything he might probably be able to earn; but a charge is to be considered in its entirety, as the jury heard it, and each part considered and construed in connection with all said upon the subject. The court instructed the jury very fully upon the question of damages in its various aspects. That portion of the charge devoted to damages covers nearly seven pages of the printed record. As a whole it fully and correctly states the law of damages as applied to the case in hand. After discussing present damages the jury was told, just preceding the portion complained of,—

"and also determine what his loss will be for decrease in earning power after arriving at the age of 21 years. You will then determine the present worth of all future damages you may allow him. . * * * And you will then determine the present worth of

such sum as you may allow him for decrease of earning power or loss of income in the future."

Closely following the portion of the charge complained of the court told the jury:

—"you are instructed you have a right to take into consideration the ability of this plaintiff to fit himself for lines of work which he might be able to do in order to earn a living. I instruct you that under the proof in this case plaintiff might be able to fit himself for a clerical position so he might earn sufficient sums of money to replace any loss by reason of impairment for performance of manual labor; and you have a right to take all the evidence into consideration, considering the age of the plaintiff, his knowledge or lack of knowledge, and determine whether in the future he will be deprived of earning a livelihood because of the injuries received in this accident, or whether his damages will be reduced in any way."

The court also discussed plaintiff's expectancy and cautioned the jury in that connection to consider its uncertainties, saying:

"You should also consider such contingencies as sickness, and his inability to earn money, and his inability to labor from other causes than from this injury at this time, or will in the future suffer in any other way than from this injury; also the fluctuations in value and demand for his services, and make full deductions for all these contingencies."

Plaintiff was mutilated and crippled for life by a lost leg and stiffened arm. Heavy damages were claimed, to the extent of $30,000 in plaintiff's declaration. Appropriate to the situation the court cautioned the jury against being influenced in their duties by sympathy, etc. No motion for a new trial was made and it is not complained the verdict was excessive, if defendant's liability was legally established.

Viewing the charge as a whole, we cannot conclude it contains prejudicial error, nor even if there was technical error in the excerpt complained of that it misled the jury or is reflected in the verdict.

The judgment is affirmed.

MOORE, WIEST, FELLOWS, STONE, CLARK, and SHARPE, JJ., concurred. BIRD, J., did not sit.